## LUCY H. WELBOURN, Executrix of JOHN E. WEL-BOURN, *vs.* WILLIAM KLEINLE.

*Partnership—Purchase of Assets by Surviving Partner—Fiduciary Relation of Surviving Partner—Failure to make Full Disclosure— Valuation of Machinery.*

A surviving partner in settling the partnership affairs sustains a fiduciary relation towards the representatives of the deceased partner, and a purchase by such survivor of the firm's assets will not be upheld unless the transaction, if attacked, is shown by him to be fair and equitable. When the surviving partner, purchasing the assets, conceals information relating thereto, which, if it had been communicated, would have prevented the sale from being made on those terms, he will be held to account to the representatives of the deceased partner for the real value at that time of such assets.

Defendant, a surviving partner, offered to buy the interest of a deceased partner, in the firm's assets and submitted to plaintiff, the executrix of the latter, a statement of the firm's business, together with his proposition. The statement has a valuation of $2,147 on the machinery and fixtures, and the offer was to purchase the merchandise and machinery at a deduction of twenty per cent from the values given in the statement. The books of the firm were not tendered to the executrix for examination, but the statement submitted agreed with the values of the different items on the books except in regard to the machinery. Some time after a sale had been made on the terms proposed, the executrix filed a bill against the defendant alleging that she had accepted his offer in the belief that the statement submitted by him contained a fair valuation of the firm's property ; that she had subsequently discovered that the machinery, etc., were valued on the firm's books at $17,848, and asked that the defendant be made to account for the value thereof in excess of the $2,147 already settled for. The evidence showed that the machinery was worth, to anyone wishing to continue the business as the defendant did, at least fifty per cent of its book value. *Held,*

1st. That the plaintiff, as executrix, was lead to believe that defendant's statement of the value of the property he proposed to purchase, was made on the basis of the book valuation, from which defendant proposed to deduct twenty per cent; that it was the defendant's duty, under the circumstances, to render an accurate statement as to the business and property and his failure to disclose the book value of the machinery, was such a concealment as entitles the plaintiff to relief.

2nd. That since the evidence establishes that the value of the machinery

to the surviving partner was fifty per cent of its book value, the plaintiff is entitled to one half of that amount less the twenty per cent required to be deducted by the proposition of purchase.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (SHARP J.), dismissing the bill of complaint.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Joseph Packard* and *Wm. S. Bansemer* for the appellant:

All surviving partners are trustees of the interests of the representatives of deceased partners, and absolute fairness is required of them in this regard. One occupying a fiduciary position is forbidden to make a profit at the expense of the party whose interest he is bound to protect, without the fullest and most complete disclosure, and must account in equity to the *cestui que trust* or party equitably interested for any such profit. Any withholding of information, ignorance of facts or of his rights on the part of the *cestui que trust*, or any inadequacy of price, will make the purchaser a constructive trustee. He "must clear the transaction of every shadow of suspicion." *Perry on Trusts*, 194, 195 and 209; *Mining Company* v. *Spooner*, 74 Wis. 320; *Turrell's case*, 10 H. L. Cas. 26; *Coles* v. *Trescotte*, 9 Vesey, 234.

The burden is on the trustee or *quasi* trustee to show that the price paid is adequate. The presumption is against it. *Ringgold* v. *Ringgold*, 1 H. & G. 70; *Pairo* v. *Vickery*, 37 Md. 485, 486; *Cumberland Company* v. *Parrish*, 42 Md. 607; *Hoffman* v. *Cumberland Co.*, 16 Md. 506; *In re Taylor Orphan Asylum*, 36 Wis. 535; *Fulton* v. *Whitney*, 66 N. Y. 551, 554.

From the situation of the parties, the fiduciary capacity in which the defendant was acting, his knowledge that the plaintiff was *inops consilii*, was ignorant of the values of the assets and was relying entirely upon his fairness, in accepting the settlement upon his valuation, he (the defendant) was placed in a position of trust far greater than that of an ordinary surviving partner. It was his duty before making any bargain

with her to put her in as complete a condition of knowledge as himself. This includes all information as to the value and the advantages of the concern, and in dealing with one not familiar with the business, additional care was required to prevent her from being deceived or imposed on. "He was bound to protect her from his own imposition as well as against any wrong from any other quarter, and the slightest pressure or unfairness would authorize her to complain." His valuations of the machinery, tools and fixtures being below a fair price, her right to the relief sought in this bill is free from difficulty. *Tenant* v. *Dunlop*, 97 Va. 244, 254; *Heath* v. *Waters*, 40 Mich. 464; *Dewey* v. *Chapin*, 156 Mass. 37; *Farnum* v. *Brooks*, 9 Pick. 233, 231; *Ricketts* v. *Montgomery*, 15 Md. 52.

As a proposition of law it is well established that surviving partners are required to dispose of the firm property to the best advantage. *Tenant* v. *Dunlop*, 97 Va. 244; *Heath* v. *Waters*, 40 Mich. 464; *Dewey* v. *Chapin*, 156 Mass. 37; *Ogden* v. *Astor*, 4 Sanford, 349; *Farnum* v. *Brooks*, 9 Pick. 231. The executor of a deceased partner is entitled to have the partnership business sold in the most advantageous manner, whether as a going concern or otherwise. *Hall* v. *Barrows*, 1 New Reports, 543.

The case is simply this, that this machinery, etc., was bought in its most valuable form, and the price paid for it was what it might have brought when torn out from the factory and sold at a most disastrous sale. In other words, Mr. Kleinle, thinking of nothing but of continuing this profitable and non-fluctuating business, paid for the valuable running plant and equipment "junk" prices. As successor he bought under the very circumstances in which Mr. Welbourn told his wife the plant ought to realize a "considerable amount." When the sum of $55,000, representing one-half of the firm's assets is in mind, $2,147.10 is far from a considerable amount.

The contention of Mr. Kleinle that no one would have paid more is, in the language of *Tenant* v. *Dunlop*, *supra*, "purely conjectural" Even where there is a certainty—to take the

most extreme case—that no one else but the surviving partner would or could buy, *i. e.*, where the subject matter is not salable, or is inalienable (public office of a law firm or government contract), the Courts have compelled the survivor to pay for it what it was worth to him.    *Ambler* v. *Bolton*, 14 Eq. 427; *Smith* v. *Mules*, 9 Hare Rep. 572.

Buying it as he did, as a thing of great value to him for which he would have had to pay elsewhere a far greater amount, his payments should have been adequate.    Not having been so, equity will require that he shall make adequate payment.    *Tenant* v. *Dunlop*, 97 Va. 254; *Heath* v. *Waters*, 40 Mich. 469; *Dewey* v. *Chapin*, 156 Mass. 36.

*Randolph Barton* and *Randolph Barton, Jr.*, for the appellee:

In considering the basis on which Kleinle should make his offer for his partner's share, he had a difficult and uncertain question to solve.    He adopted what was, we should think, the wisest, and certainly was, so far as plaintiff is concerned, the fairest he could have selected, and exactly the course Welbourn and he had adopted when purchasing the interest of Rennous.    In his proposition he separates these items—cash, open accounts, merchandise and plant or machinery.    He could readily adjust the cash, as also the open accounts, which latter he arranged to divide as they were collected.    As to the merchandise and machinery he determined that his risk in buying so large an amount of these in bulk compelled him to ask a large discount, 20 per cent, from their estimated value. The plaintiff agreed to this and does not question that agreement now.    In estimating the *values* of these items, however, a difficulty at once presented itself.    The merchandise was fairly easy of accurate computation.    Passing through the establishment more or less rapidly its book value at any time represented very closely its *actual market value*.    It was of its very nature a salable article, subject nevertheless to the usual vicissitudes of business.    Hence Kleinle adopted the book values of the merchandise as representing its actual value.

But with the *machinery and plant* the case was very differ-

ent. It had a *book value* to be sure, taken in 1894, based upon estimated *original* cost, but totally misleading as a basis of *actual intrinsic selling* value in 1896. Therefore Kleinle was compelled of necessity to fix upon a new valuation. On what basis should he proceed? He had many circumstances to take into account. First and foremost was this: Welbourn had died first, leaving a partner (Kleinle) to buy out the whole business and continue to operate it. But suppose Kleinle were to die, or desire or be compelled to retire; who would come forward to buy him out? The whole establishment would then be thrown on the market, and what would it bring then, not as a "going concern, sold out to a successor," but as old machinery, pure and simple? Moreover, Kleinle did not even control, for more than a year, the building he was in, and a forced removal might at any time compel a sale of machinery.

Under these circumstances he foresaw the time when it was not only possible, but almost certain that he would have to subject the whole plant and machinery to the test of a sale on the open market. In other words, he saw the coming of the day when he or his representatives would, in all likelihood, have to adopt the same means of disposing of the machinery that Mrs. Welbourn would at this very time have been compelled to adopt had not Kleinle offered to acquire her interest. See *Walker*, *Adm.*, v. *House*, 4 Md. Ch. 49.

It was strenuously argued by plaintiff below, and testimony of plaintiff's witnesses was admittedly based upon the theory that the *actual value* of the machinery was *what it was worth to Kleinle as a going concern.* Let us examine this proposition : In the first place, what an article may be worth *to the purchaser* can manifestly not represent exactly its market value, because the very reason of his making the purchase is that the thing purchased is more desired by him than the money he gave for it. A very hungry man might think a meal was worth to *him* $5.00, and yet if such a meal could be obtained for 50 cents, *that* and not $5.00 would be its market value. Even assuming then that Kleinle could have *made profitable use* of this machinery at its inflated book value of $17,603.24,

and even assuming (though Kleinle, the only witness on this point, emphatically denies it) that rather than not get the machinery, he would have been willing to pay such an exhorbitant price, *that* would not fix its real value. Kleinle was under no obligation whatever to buy the property. He could have retired and let it bring what it could *on the market, at public or private sale*, or he might have let it go to sale and then bid in himself, in which case he assuredly would have been under not the slightest obligation to bid higher than he had to, even though he thereby acquired the machinery at a price much below what *in an emergency* he would have been willing to increase his bid to. *Walker* v. *House*, 4 Md. Ch. 49. Hence, when for the first time in the history of the firm a valuation was to be put upon the plant and machinery for selling purposes, Kleinle realized that he must base his estimate not only upon what he, *in competition with the general public*, might be willing to give Mrs. Welbourn for it, but upon what the general public, with no surviving partner to compete with, would be willing to give *him* or his estate for the property. Is it not apparent that Kleinle's only safe course, in justice to himself, was to say : " What could I, or any one else, buy this machinery for if I refuse to make a private offer and allow it to go to sale ? Furthermore, after having bought it, what could *I* or my representatives, should I die, sell it for ? This is the theory on which he made the estimate of values which he thereupon submitted to Mrs. Welbourn. This is also the theory upon which his witnesses testified. And that this is the correct one hardly needs authority to sustain it.

The cases hold that, independently of the right given in the co-partnership agreement, Kleinle possessed the right to buy out his deceased partner's interest. " Such sales, when fairly made, should be not only upheld, but encouraged." *Kimball* v. *Lincoln*, 99 Ill. 578; *Valentine* v. *Wyson*, 123 Ind. 47; *Parson* "Partnership" 4th ed. 438, note ; *Lindley* "Partnership" 2nd Amer. ed., vol. 2, p. 1299, n. 1; 17 *Ency. of Law*, 1169; *Harbster's Appeal*, 125 Pa. St. 1; *Moses* v. *Moses*, 50 Ga. 9; *Sage* v. *Goodwin*, 66 N. Y. 578; *Rosenzweig* v. *Thompson*, 66 Md. 593.

In the present case, the misconduct complained of was at
most "a misrepresentation as to mere matter of opinion, as
distinguished from one in respect to an ascertainable fact, and
hence was immaterial." *Buschman* v. *Codd*, 52 Md. 202.
Then, too, the plaintiff's claim here asks for a rescission of
the contract in part, and not as a whole.   She got the full ad-
vantages of all the other (and by far the largest) features of
the contract, and now she seeks, as to this item alone, to make
the plaintiff, in effect, reopen his offer and force him to offer
more.   The plaintiff unquestionably viewed the offer origi-
nally as a whole, and while she may have thought, and prob-
ably did think, that in some respects it was too low, yet as a
whole it seemed advantageous and was accepted.   Can she
now pick out this one item and repudiate it ?   But, after all,
the original question recurs :  Did Kleinle give for the ma-
chinery a price which was "manifestly inadequate and pat-
ently erroneous ?"   If he did, then what evidence has the
plaintiff offered which can give this Court, with any sort of
reasonable certainty, any basis on which it can determine what
a "manifestly adequate and patently correct" compensation
would be ?

PEARCE, J., delivered the opinion of the Court:

On June 1, 1888, John E. Welbourn and William Kleinle
entered into a co-partnership under the firm name of Rennous,
Kleinle & Co., for the manufacture of brushes in the city of
Baltimore, which partnership continued until the death of
Welbourn, May 17, 1896.   The articles of co-partnership
stipulated that upon the death of either partner the business
should continue on joint account till the 1st of June following,
and that if death should occur between January 1st and June
1st of any year, the estate of the deceased partner should be
credited with the full share of the year's profits, the same as
if he had lived ; and that if the survivor should decide to con-
tinue the business, he should take the deceased partner's share
by giving the notes of the new firm in equal amounts, at nine,
ten, eleven, twelve, thirteen and fourteen months, to be dated

June 1st after such death, with interest, or such equitable mod-
ification of terms as the executor should agree to under the
advice of the Orphans' Court. By his will, Welbourn appointed
his wife, Lucy H. Welbourn, his executrix, and upon his death
she duly qualified as such.

On June 29, 1896, Kleinle, the surviving partner, submitted
to Mrs. Welbourn, as executrix, what he designated "a state-
ment of the business of the firm of Rennous, Kleinle & Co.,"
accompanied by his proposition for settlement of the firm's
affairs.

This statement showed net assets of $108,487.98, from
which he deducted twenty per cent on merchandise and fixtures
to cover risk of loss, leaving each partner's share $47,099.91,
and his proposition was to give the executrix eight notes for
$5,000 each, with interest, maturing in one, two, three, four,
five, six, seven and eight years respectively, and to pay the
balance, $7,099.91, during the year between June 1, 1896, and
June 1, 1897, as collected from debtors of the firm.    The exec-
utrix accepted this proposition, and on July 18, 1896, con-
veyed to Kleinle all her testator's interest in the assets of the
firm.    Kleinle executed and delivered the notes provided for,
all of which have been since paid, as well as the balance above
mentioned.

In the statement submitted by Kleinle to Mrs. Welbourn,
the item of "fixtures and machinery" was stated as amounting
to $2,147.10, and the controversy in this case has exclusive
reference to the correctness and fairness of this item.

On July 1, 1899, Mrs. Welbourn, as executrix of her hus-
band, filed the bill in this case, setting forth all the above facts,
and alleging that her husband, shortly before his death, de-
clared to Mr. Kleinle in her presence that in view of their long
time personal friendship and business relations he reposed ab-
solute trust and confidence in his settlement of the partnership
affairs after his approaching death, and that he expected and
believed that he would make a fair, just and equal division of
all the partnership funds and assets ; that when she accepted
the proposition made to her, she did so in the same confidence,

and in the belief that the valuation of the fixtures and machinery shown in said statement was a fair and accurate valuation, having then no knowledge nor means of knowledge of any fact which could lead her to think otherwise ; but that she had recently learned that said fixtures and machinery were on May 31, 1896, valued on the books of the firm at $17,848.55, and after deducting twenty per cent as agreed on, were fairly and reasonably worth $14,322.59, on which basis there was still due her as executrix in equity and good conscience $6,087.84, and she prayed that Kleinle should set forth a detailed list of all said fixtures and machinery with the true values thereof, and should account to her for all such values in excess of the $2,147.10 already settled for.

The defendant answered fully, alleging that the valuation of the fixtures and machinery was perfectly fair and accurate. He denied that the paper submitted by him with his proposition purported to show the condition of the partnership, the assets thereof, or the interest of the deceased partner therein, in the sense implied by the plaintiff's bill, and averred that it was no more than a proposition on his part to purchase the interest of his deceased partner at a price which in his judgment he could afford to give, and he denied that he had violated or neglected any obligation resting upon him as surviving partner, or that any act of his was in contravention of the partnership agreement, or inequitable towards the plaintiff. Testimony was taken and the Court (JUDGE SHARP), passed a decree dismissing the bill, from which decree this appeal is taken.

The law governing this case, we think, is free from difficulty, though its application to a transaction between a surviving partner and the personal representative of a deceased partner does not seem to have been considered in any reported case in this State, and from the argument of counsel herein, we apprehend that it is upon the facts alone, that our view differs from that of the learned Judge of the Circuit Court, who filed no opinion with his decree.

In *Parsons on Partnership*, 441, 2, it is said : "Surviving

partners are held strictly as trustees, and their conduct in discharging their trust is carefully looked after by Courts of equity." The law is stated in similar language in *Bates on Partnership*, sec. 743, and in *Perry on Trusts*, vol. 1, sec. 178, *et sequente.* Whether it is technically accurate to designate them trustees is not material, since there is a general concurrence among text writers, and in the decided cases that they are trustees in a certain sense, and that they sustain a fiduciary relation to the representatives of the deceased partner. This doctrine we understood to be tacitly conceded as correct by appellee's counsel, and we do not think it could be successfully controverted, notwithstanding LORD WESTBURY's contrary view in *Knox* v. *Gye*, L. R., 5 Eng. and Irish Appeals, 656, which called forth from the Lord Chancellor, LORD HATHERLEY, " a protest against language" which, he says, " was to me entirely novel, that there was no fiduciary relation between the survivor of two partners and the executor of a deceased partner."

An exception to the rule that a trustee can not purchase the trust property is made in the case of a surviving partner, who may purchase the interest of a deceased partner from his executor or administrator, and in the case before us the articles of co-partnership expressly authorize such purchase ; but all such purchases, whether authorized by the articles or not, "on account of the generally dangerous inequality of knowledge with respect to the subject matter of the purchase and sale, are regarded with suspicion, will be carefully scrutinized, and only be allowed to stand, if assailed, where they appear to have been reasonable, fair and just." *Tennant* v. *Dunlop*, 97 Va. 342.

In such cases, " the law by which the surviving partner must regulate his conduct is *a law of jealousy." Porter* v. *Woodruff*, 36 N. J. Eq. 174.

" The trustee must clear the transaction of every shadow of suspicion." 1 *Perry on Trusts*, sec. 195.

" The exception is one difficult to make out." *Per* LORD ELDON in *Coles* v. *Trecothick*, 9 Vesey, 246.

As expressed by Le Grand, C. J., in *Hoffman Steam Coal Co.* v. *Cumberland Coal and Iron Co.*, 16 Md. 506, "Permission is given to the trustee to show the perfect *bona fides* of the transaction, and circumstances relieving it from the censure of the law." In *Pairo* v. *Vickery*, 37 Md. 485, Bartol, C. J., said of contracts between persons sustaining fiduciary relations: "The *onus* of showing their perfect fairness is cast upon the party who sets them up, and not upon the *cestui que trust* who assails them." And in *Cumberland Coal and Iron Co.* v. *Parish*, 42 Md. 606, Alvey, C. J., said: "It is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential or fiduciary relation, the *onus* being upon him to establish the perfect fairness, *adequacy* and equity of the transaction."

With these general principles in view, establishing the duty to inquire into this transaction, let us ascertain how the parties are affected by the facts as disclosed by the testimony.

The only information, either given or offered by Kleinle to Mrs. Welbourn, as to the state of the partnership accounts and assets, is that contained in the following paper submitted to her by him:

*Baltimore, Md.*, June 29, 1896.

Mrs. John E. Welbourn:

The following is a statement of the business of the firm of Rennous, Kleinle & Co., and my proposition for a settlement.

### Assets.

| | | | | |
|---|---:|---|---:|---|
| Cash | | | $ 6,491 | 43 |
| Merchandise | 69,293 | 70 | | |
| Fixtures and Machinery | 2,147 | 10 | | |
| | | | 71,440 | 80 |
| Debtors | | | 46,946 | 98 |
| | | | $128,879 | 21 |

### Liabilities.

| | | | | |
|---|---:|---|---:|---|
| Borrow and Loan acct | 13,846 | 17 | | |
| Creditors | 197 | 17 | | |
| Reserve fund | 2,347 | 35 | 16,391 | 23 |
| Surplus due W. K. & J. E. W. | | | 108,487 | 98 |

Less 20 per cent deducted on merchandise, machinery, and fixtures. . . . . . . . . . . . . . . . . . . . . .                    14,288 16

                                                  2)94,199 82

Net value of each partner's share.                47,099 91
My proposition is to give you my notes at one and eight years, for $5,000 each, with interest from June 1,'96, amounting to..    40,000 00
And balance in equal instalments during the year from June 1, '96 to June 1, '97, more or less as shall be collected. . . . . . .    7,099 91

                                                  $47,099 91

            Your early attention will oblige,
                    Yours, &c.,
                        WM. KLEINLE."

The books of the firm were not tendered for her examination, and no explanation was made as to how the several items were ascertained.

The paper, however, upon its face is " a statement of the business of the firm," *and* a " proposition for settlement," and there is no ambiguity as to where the statement ends, and the proposition begins. The deduction of 20 per cent on merchandise, machinery and fixtures is plainly part of the proposition for settlement, though it precedes the verbal statement of the proposition. The statement of the business of the firm ends where the surplus is shown of $108,487.98 due W. K. and J. E. W.

The more natural verbal order would have been this :
Surplus due W. K. & J. E. W. . .                 $108,487 98
Net value of each partner's share $54,243 99
    My proposition is to deduct 20 per cent from machinery, merchandise, &c., thus :
Amt. due J. E. W. . . . . . . . . . . .    $54,243 99
Less ½ deduction 20 per cent. .     7,144 08

                                    $47,099 91

and to give you my notes, at one and eight years, &c.," as before set out.　This shows the same result, but separates more clearly the statement of the business of the firm from the proposition for settlement.

It was his plain duty to render her an accurate statement of the condition of the firm when negotiating with her for the purchase of the interest of his deceased partner, which she represented in her fiduciary relation as executrix of her husband, and such, from its form and designation, she must have understood it to be, and not a mere arbitrary valuation as to any item therein, made by Mr. Kleinle with exclusive reference to his contemplated purchase.

In the leading case of *Ogden* v. *Astor*, 4 Sandford's S. C. 350, 334, 335, it is said : ." It is incumbent on surviving partners to give to the administrator of a deceased partner a full statement of all the property of the joint concern ;" and " to make all the disclosures necessary to enable the administrator to form a correct judgment as to the condition of the partnership affairs," " or which in the mind of a prudent person would be likely to affect the question of the accounts." And in *Perry on Trusts*, vol. 1, sec. 178, (4th ed.), it is said : " If a partner who keeps the accounts of the firm should purchase his co-partner's interest without disclosing the state of the accounts, the agreement could not stand."

Was this then such a statement as the law requires ?　Mr. Kleinle in his sworn answer says this paper "did not purport to show the condition of the partnership, nor its assets, nor the interest of the decedent therein," and that it was only a proposition for the purchase of the interest of the deceased partner at a price which he (Kleinle) could afford to give"; though he testified subsequently that after Mrs. Welbourn qualified as executrix, he told her he could do nothing "till he could get up a *statement of the business*", and that on June 29th he "got the *statement* ready and sent· it to her with a proposition for buying out her husband's interest."　A statement of the business of a firm, necessarily implies the exhibition of its *existing condition* as disclosed by the books of the firm (the only au-

thentic record of its condition from time to time), and not an arbitrary *estimate* of the condition representing the ideas of a prospective purchaser. Mrs. Welbourn was entitled to the benefit of comparison between the value of her husband's interest in the assets of the firm as *ascertained* by both the partners on the books of the firm while their interests were common, with the value thereof as *estimated* by Mr. Kleinle when their common interest had been severed, and when, as a prospective purchaser of its deceased partner's share, their interests had become conflicting, and we think it is plain from the testimony that both she, and Mr. Guest, whom she consulted as to the proposition, understood the statement submitted to be made out on that basis, and with that view, and that the difference between these valuations was measured by the proposed deduction of twenty per cent on merchandise, machinery and fixtures. Mrs. Welbourn testifies : "I supposed the valuations came directly and accurately from the firm's books, it being the close of the business year June 1st," She also says that Mr. Guest had no other knowledge of the condition of the firm than what was conveyed by that paper ; that her only object in consulting him was as to the allowance of the twenty per cent discount, and that he told her, as her husband trusted Mr. Kleinle, he supposed he was giving her a fair settlement and he did not know that she could do any better than take it; that she told Mr. Kleinle she thought twenty per cent was a very great deduction, but he said that was the best arrangement he could make for her and there was nothing better for her to do. It is admitted that every item in the statement did truly and accurately represent the actual condition of the firm as shown by the books, except the item of machinery and fixtures which in the statement rendered, stood at $2,147.10, while on the books it stood at $17,848.55. It is not possible to believe, if this item had been entered in the statement as of its book value, and had been offset by the deduction therein of $15,701.45, as actually made in Mr. Kleinle's mind and as a part of his proposition, that Mrs. Welbourn would have acceded to such a deduction, in

addition to the twenty per cent discount, or that Mr. Guest
would have advised her to do so, without thorough investigation
and full proof of the actual value of the machinery with a view
to continuance of the business at the old stand.   It is not
necessary to find that Mr. Kleinle purposely refrained from
giving the book value of the machinery, and substituted for it
his own estimate of value, with a view to procuring an advan-
tage in the purchase, and we are not to be understood as in-
timating that this was his purpose.   The statement being con-
ceded to be in all other respects fair and accurate, and he having
advised Mrs. Welbourn before accepting the proposition, to
consult Mr. Guest, her husband's uncle and adviser, we do
not feel justified in imputing to him any wrongful purpose ;
but his failure to disclose the actual condition of the books,
as to the item of machinery, necessarily misled Mrs. Wel-
bourn and Mr. Guest, and would have equally misled the most
skilled and expert adviser whom she could have sought.   In
cases of trust and confidence such as this, " even an innocent
withholding of information, that is, where the party himself is
not aware of the importance of it, will be ground of relief."
*Ogden* v. *Astor, supra ; Maddox Ch. Prac.*, 2nd ed. 262.

And in *Huguenin* v. *Baseley*, 14 Vesey, 300, in a proceeding
to set aside a conveyance alleged to have been improperly ob-
tained it is said: "Though the defendant and his attorney were
perhaps not aware of the duties which this Court required
from them in the situation in which they stood, yet where the
decision rests upon the ground of public utility, for the pur-
pose of maintaining the principal it is necessary to impute
knowledge which the party may not have actually had."   We
have reproduced the above language of LORD ELDON not only
for the purpose of illustrating the principles upon which Courts
of equity proceed in such cases, but for the purpose of em-
phasizing the fact that we attribute no fraudulent intent to Mr.
Kleinle.   But when this is said. without prolonging this opin-
ion by reviewing all the evidence, which has been carefully
read and considered, we do not see how he is to escape the
consequences of his neglect to render such a statement of the
condition of the firm as we have said the law requires.

The remaining inquiry relates to the value of the machinery and fixtures to be taken in granting relief.

It is said in *Parsons on Partnership*, 521, note f, that where a surviving partner improperly acquires the interest of a deceased partner, or neglects to account for the assets, he may be charged with the highest value which the proofs show; and this was so held in *Killefer* v. *McLain*, 78 Mich. 252. In *Ringgold* v. *Ringgold*, 1 H. & G. 71, in the case of a trustee under a deed, the Court said: " Where trustees dispose of the title to lands, contrary to the express injunction of the instrument under which they act, and there is no possible means by which the Court can reinstate the complainants in their interest, they will be charged with the utmost value of the property ; " and in *Ricketts & Whittington* v. *Montgomery*, 15 Md. 46, the Court cited *Ringgold* v. *Ringgold*, and applied the above principle to a person acting in a fiduciary capacity who purchased on his own account a steamer which his duty required him to sell for the benefit and interest of another, and which was lost at sea and could not be returned. But the true rule in a case like the present is, we think, well stated in *Tennant* v. *Dunlop*, 97 Va. 254, to the effect that where a surviving partner has acquired the interest of a deceased partner, or some particular asset of the firm, for an inadequate consideration, through some mistake of fact, or mistaken claim of right, or under other circumstances not involving actual fraud on his part but which call for redress, the proper measure of relief is the real value of the interest or asset.

The testimony produced on the part of Mr. Kleinle, upon whom as we have said rests the burden of proof, came from himself, Mr. Lord, Mr. Dugan and Mr. Pattison, and was general and inconclusive. His own estimates, we think, took no real account of the value incident to the continuance of an established and successful business at the old stand, Mr. Lord's principal business was in the manufacture of wooden ware and he had no power-machinery for brush making. He had never seen Rennous & Kleinle's machinery and did not attempt to put a value on it. His own machinery cost from

$1,200 to $1,500, and sold for about $300, but it was sold under an assignment for benefit of creditors.

Mr. Dugan is a manufacturer of machinery for working in wood and iron, but knew nothing of Rennous & Kleinle's machinery. He thought second-hand machinery in Baltimore would bring about ten to fifteen per cent of original value and repairs; but it would bring more if purchased by one proposing to continue the business at the same place, and that some machinery brings pretty good prices. Mr. Pattison is an experienced auctioneer and thought second-hand machinery generally brought about ten per cent of its cost value. He could not recall any sale of machinery to a going concern in bulk, but did recall one where the owner of the factory building bought in bulk for $1,325, wood-working machinery which he *supposed* cost from $5,000 to $8,000, with the idea of forming a stock company.

On the other hand, Mrs. Welbourn produced three witnesses, all of whom were acquainted with the machinery and were thoroughly qualified to judge of such values. Mr. Wright had been with Rennous, Kleinle & Co. for twenty-two years, and testified that this machinery was worth to any one wishing to continue the business, at least fifty per cent. of its book value. He filed an inventory made by the firm in 1894 showing an aggregate of $18,464.56, and in parallel columns estimates of the value of such of the items as escaped the fire of March, 1899, made after the fire by himself and Leonard Rettman, showing $8,391.20, and states that all these items were in the factory June 1, '96.

Mr. Rettman is a practical brush-maker from Boston, of eight years' experience, two of which were with Rennous, Kleinle & Co., and has much experience in buying and selling new and old machinery. He aided Wright in making his appraisement, and says those values are in his judgment just and fair as between a retiring and a continuing member of the firm.

Mr. Swormstedt is a machinist of forty-five years experience, and an insurance adjuster. In this capacity, he examined the

machinery after the fire and filed a list of his valuations set opposite the valuations of the inventory of 1894, with which his values compare closely where but slight damage of the article was suffered. He says, Wright and Rettman's values were fair and reasonable as between partners, and that the machinery placed by Kleinle at $2,147.10 would have brought four times as much.

Mrs. Welbourn filed a paper being a statement of the condition of the firm June 1, 1894, made for the firm by its bookkeeper, and found among Mr. Welbourn's papers in which machinery is shown, $14,518.74, and Mr. Welbourn noted on the statement that each partner's share of the machinery representing capital was $4,674.75, or both $9,349.50, which is little more than sixty per cent of book value. Wright and Rettman fix the fair value at not less than fifty per cent, and Swormstedt says four times $2,741.10, or $8,588.40, and we think fifty per cent, upon this state of the proof, is a fair value.

50 per cent of $17,848.55 is . . . . . . . . . . . . . . . . .　$8,924 27
Deduct value already accounted for. . . . . . . . . . .　2,147 10

　　　　　　　　　　　　　　　　　　　　　　　$6,777 17
Deduct 20 per cent as per proposition of purchase　1,355 43

　　　　　　　　　　　　　　　　　2)$5,421 74
One-half due Mrs. Welbourn with interest from ————
　June 1st, '96. . . . . . . . . .　. . . . . . . . . . . . . . . .　$2,710 77
We think a decree should be made accordingly.

It is proper to note that as Mrs. Welbourn knew nothing of the value at which this machinery was caried until the books came into her son's possession on his entering the new firm after the fire, she has been guilty of no laches in prosecuting this suit.

The decree of the Circuit Court will be reversed and the cause will be remanded that a decree may be made in conformity with these views.

> *Decree reversed with costs to the appellant above and below, and cause remanded.*